UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LISA D. WOOD,

    Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner,

    Defendant.

No. 11 C 1033

Magistrate Judge Sidney I. Schenkier

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff Lisa Wood seeks an order reversing and remanding the final decision of the Commissioner of Social Security ("Commissioner") denying her applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") (doc. # 23). For the reasons set forth below, the Court grants Ms. Wood's motion.

### I.

We begin with the procedural history of this case. Ms. Wood applied for benefits in January 2008, alleging that she became unable to work due to her disability beginning on May 1, 2007 (R. 85). Her claims were denied initially and upon reconsideration (R. 77-80). A hearing was held before Administrative Law Judge ("ALJ") Jose Anglada on March 24, 2010, and on June 10, 2010, the ALJ issued an opinion denying her benefits. The Appeals Council declined Ms. Wood's request for review of the ALJ's decision (R. 1), making the ALJ's ruling the final decision of the Commissioner. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013).

---

[1] On November 3, 2011, by consent of the parties and in accordance with 28 U.S.C. § 636(c), this matter was reassigned to this Court for all further proceedings, including the entry of final judgment (doc. # 16).

## II.

We next review the administrative record. We set forth the general background and medical record in Part A, the hearing testimony in Part B, and the ALJ's opinion in Part C.

### A.

Ms. Wood was born on December 4, 1963 (R. 135), and she was diagnosed with arthritis at age four (R. 46). Since the 1990s, she has had chronic pain in her hands, wrists, left elbow, shoulders, anterior hips, knees, feet, lower back, and neck (R. 354). As early as June 2007, she also began experiencing migraine headaches (R. 578). We address first her arthritis and chronic pain symptoms, followed by her migraines.

#### 1.

Since 2002, Ms. Wood has regularly visited her primary care physician, Dr. Penka Zamfirova with complaints of back and joint pain, and she received periodic diagnostic tests. X-rays from September 2004, for example, revealed minimal degenerative changes in her spine, shoulder joints, and left hip (R. 625-28). On November 20, 2007, Ms. Wood reported knee pain with migration to the ankles, shoulders, elbows, and hands, and Dr. Zamfirova recommended that she have a rheumatology consultation (R. 576).

Ms. Wood first visited Dr. Daniel Hirsen, a rheumatologist, on January 2, 2008 (R. 354). X-rays from that visit showed that Ms. Wood had a slight relative narrowing of the left hip joint, degenerative changes of the lower lumbar spine, signs of juxta-articular osteopenia (soft tissue swelling and loss of joint space indicative of active inflammation), and cystic changes involving multiple carpal bones in her hands (R. 354, 474, 612). Dr. Hirsen prescribed Sulfasalazine for inflammation from arthritis, but Ms. Wood had an allergic reaction to that medication so she switched to Plaquenil, another anti-rheumatic drug (R. 354). That month, Ms. Wood also had a

severe allergic reaction to the pain medication Fentanyl, which she was given while undergoing a breast biopsy (R. 261). After several visits with Ms. Wood, Dr. Hirsen drafted a letter on April 2, 2008, diagnosing Ms. Wood with seronegative rheumatoid arthritis (rheumatoid arthritis where the blood test is negative for rheumatoid factor) (R. 354).

On February 7, 2008, a Social Security Administration ("SSA") employee conducted an interview with Ms. Wood. The employee observed that Ms. Wood walked and sat slowly, her fingers were starting to curl up from arthritis, and she cried when describing how her condition limits her activities (R. 167).

On May 2, 2008, Dr. Sandra Hare conducted an internal medicine examination of Ms. Wood for the Bureau of Disability Determination Services ("DDS") (R. 356). Dr. Hare observed that Ms. Wood had a normal gait, did not require an assisting device to ambulate, could walk fifty feet without difficulty, walk heel to toe, squat, and do the tandem gait (R. 358-59). She also had full finger grasp and grip strength and range of motion in her hands (R. 359). Dr. Hare did not notice any significant joint changes or active inflammation, edema, or warmth (except mild thickening at the right wrist), but she noted that Ms. Wood was being treated with "significant anti-inflammatory agents" (*Id.*). An X-ray showed a reversal of the normal S-curve of the lumbosacral spine, significant narrowing of all the joint spaces throughout the thoracolumbar spine, arthritic changes at multiple levels, a question of bone loss or osteopenia of the lumbosacral spine, and a question of mild impingement of the neural foramina at L5-S1 (R. 362). Dr. Hare diagnosed her with mild to moderate dextroscoliosis with chronic low back pain, a question of degenerative disease of the spine, and a question of rheumatoid arthritis (R. 359).

On May 13, 2008, DDS physician Virgilio Pilapil, completed an RFC assessment of Ms. Wood based on the medical evidence. He recorded his primary diagnosis as seronegative

3

rheumatoid arthritis and his secondary diagnosis as mild to moderate dextroscoliosis (R. 363). He also noted that she has low blood pressure as a reaction to medication (R. 370). Dr. Pilapil opined that Ms. Wood could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, and stand/walk/sit about six hours in an eight-hour workday (R. 364-65). She could kneel and crouch occasionally and should avoid concentrated exposure to extreme cold, but she had no manipulative limitations (R. 365-67). Dr. Pilapil stated that the alleged limitations in Ms. Wood's activities of daily living were excessive in light of the medical evidence (R. 370). DDS physician Reynaldo Gotanco affirmed Dr. Pilapil's RFC on August 13, 2008, finding Ms. Wood's allegations "credible but they do not affect her functioning significantly" (R. 376-77).

Ms. Wood continued to see Dr. Zamfirova in July 2008, complaining of pain in her back, joints, and fingers, as well as fatigue, weight loss, and stiffness (R. 549-50). On July 22, 2008, an MRI of Ms. Wood's lumbar spine indicated a small protrusion and minimal bulging of certain disks, as well as degenerative changes with bone spurs, and hemangioma (abnormal build-up of blood vessels in skin) below the L1 vertebra (R. 455-56).

Dr. Zamfirova completed an RFC questionnaire on April 23, 2009. She noted that due to progressive rheumatoid arthritis, Ms. Wood suffered from joint pain, swelling, stiffness, lower back pain, and low blood pressure, with pain localized in her hands, spine, knees, and feet (R. 394). Ms. Wood takes medication for her pain – Plaquenil and Calan – but they cause her to suffer from weight and appetite loss, hair loss, upset stomach, dizziness, and headaches (R. 395). Dr. Zamfirova opined that Ms. Wood's pain constantly interferes with her ability to concentrate (*Id.*). She opined that Ms. Wood can sit/stand for fifteen minutes at a time, can sit/stand/walk for less than two hours in an eight-hour working day, cannot stoop or crouch, and would need to

4

walk around periodically and take two to three unscheduled breaks per hour (R. 396). Further, Ms. Wood can use her hands to grasp, turn, or twist objects only ten percent of a work day, and she cannot do fine manipulations with her fingers, reach overhead with her arms, or lift or carry weight in a competitive work situation (*Id.*). Dr. Zamfirova opined that Ms. Wood will likely be absent from work more than four times a month due to her impairments (R. 396-98). Treatment notes from Dr. Zamfirova show that Ms. Wood continued to complain of fatigue, body aches, and joint pain throughout 2009 and January 2010 (R. 531-46).

Dr. Hirsen completed an RFC questionnaire on March 2, 2010, discussing Ms. Wood's limitations due to her seronegative rheumatoid arthritis and chronic pain in her lower spine, neck, hands, and feet (R. 634). He opined that Ms. Wood's pain and other symptoms would frequently interfere with her ability to concentrate on simple work tasks, and she is incapable of "low stress" jobs. He concluded that she can sit/stand for twenty to thirty minutes at a time, sit/stand/walk for less than two hours total in an eight-hour work day, occasionally move her head in different directions or hold her head still, occasionally twist, rarely stoop or squat, never climb ladders or stairs, and never lift or carry weight at work (R. 636-38). Dr. Hirsen further opined that Ms. Wood has significant limitations with reaching, handling, or fingering; and she will need to take approximately ten unscheduled breaks and have periods of walking around during the work day (*Id.*). He opined that she would miss more than four days of work per month due to her impairments (*Id.*).

2.

At her June and November 2007 appointments with Dr. Zamfirova, Ms. Wood also complained of having migraines (R. 576, 578). In January 2008, she reported taking over-the-counter medications for her headaches, such as Tylenol or Excedrin (R. 261).

In July 2008, Dr. Zamfirova referred her to neurologist Prasad Chappidi, M.D., for evaluation. On July 28, 2008, Dr. Chappidi opined that Ms. Wood had chronic migraines, chronic pain syndrome of the L5-S1 radiculopathy, and possible restless leg syndrome (R. 493). He prescribed Elavil for pain prophylaxis and recommended physical therapy (*Id.*). Physical therapy notes from July 31, 2008 state that Ms. Wood complained of tingling and burning neck and back pain, and she had tenderness on palpitation (R. 454).

In September and October 2008, Dr. Chappidi noted that Ms. Wood could not tolerate Remeron or Inderal for headache pain prophylaxis, so in November 2008, he prescribed Migralief and Relpax (R. 490-92). On December 16, 2008, Dr. Chappidi noted that she was doing "reasonably well on Migralief," and he also prescribed Calan for headache relief (R. 489).

Ms. Wood continued to complain of migraine headaches throughout 2009 and January 2010 (*see* R. 531, 534, 541). In September 2009, Dr. Chappidi increased her dose of Calan (R. 486). He had found no evidence of Parkinson's disease or restless leg syndrome (R. 487), and her EEG and brain MRI were essentially normal (R. 524, 528).

On March 4, 2010, Dr. Zamfirova completed an RFC questionnaire addressing Ms. Wood's headaches. She stated that Ms. Wood's headaches occur approximately twice a week, lasting one to two hours (R. 641). Stress and bright lights trigger them, and movement and noise worsen them (*Id.*). Lying in a dark room, cold/hot packs, and medication (including naproxen, a nonsteroidal anti-inflammatory drug, and zolpidem, a sleep sedative) help her feel better (R. 642-43). Ms. Wood's headaches and side effects from the medication she takes for them have caused her to suffer from nausea, weight loss, impaired sleep, impaired appetite, and gastritis (*Id.*). Dr. Zamfirova opined that she would be unable to perform basic work activities when she has a headache, would need to take two to three ten-minute, unscheduled breaks during an eight-

6

hour working day, is incapable of even "low stress" jobs, and is likely to be absent from work more than four times a month due to her impairments (R. 643-44).

C.

Ms. Wood drove herself to the hearing on March 24, 2010 (R. 41). She testified that she last worked in about April 2007 as a waitress,[2] but she quit after a year and a half because the restaurant downsized, waitressing had become too painful for her, and her mother was ill at the time and needed help (R. 42-45).

Ms. Wood testified that she has pain in her back, hands, and feet from arthritis, and she gets migraines about once or twice a week that last for hours (R. 64-65). She suffers side effects from her arthritis and migraine medication, including hair loss, nausea, weight loss, fatigue, dizziness, dry mouth, and a weaker immune system (R. 58).

Ms. Wood testified that on a typical day, she wakes up about 5:00 a.m., makes coffee, and tries to stretch (R. 50-51). Ms. Wood can perform personal hygiene tasks, such as brushing her teeth and showering, but she needs a friend to dye her hair and wears slip-on shoes because sometimes she has trouble tying her laces (R. 67). Her seventeen-year-old son fixes breakfast for himself, and usually makes dinner because it is difficult for her to bend down to get pots and pans stored beneath the oven (R. 52). Ms. Wood prepares about one meal a day for herself, usually lunch (R. 51). She washes dishes, waters the plants, tries to make her bed daily, and vacuums every two or three days (R. 54). She does not have enough hand strength to do laundry or clean the house (R. 64). She goes to bed by 10:30 or 11:00 p.m., but it takes her a while to fall asleep (R. 50). She does not sleep or lie down during the day (R. 62).

---

[2] On an earlier disability form, Ms. Wood indicated that she last worked in June 2007 (R. 171).

7

Ms. Wood testified that she can walk one to two blocks without pain, sit and stand about twenty minutes at a time, and carry up to five pounds (R. 56). She enjoys reading (R. 58), and she can do it for hours (R. 60). She initially testified that she cannot sew or knit (R. 59), but later stated that she can sew and knit for about thirty minutes before her hands start to tighten up (R. 63). She only spends about twenty minutes on the computer per day and has difficulty writing long letters because her fingers cramp up (R. 59, 66).

The vocational expert ("VE") testified next. The ALJ asked her to assume a younger individual with a high school education and low-end, semi-skilled light to medium work experience, with the following limitations: can lift and carry twenty pounds occasionally and ten pounds frequently; can stand or walk for about six hours in an eight-hour workday; can sit about six hours in an eight-hour work day; cannot work at heights, climb ladders, or frequently negotiate stairs; can occasionally stoop, kneel, squat, crouch, or crawl; and should avoid extremely cold temperatures and moving or dangerous machinery (R. 72). The VE testified that the individual would be limited to light work, but could not waitress full-time because that requires more than six hours of standing and walking (*Id.*). Other light, unskilled jobs would be available in significant numbers in the Chicago Metropolitan area, including an office helper, an information clerk, or a counter clerk (R. 72-73).

The ALJ then added the restriction that the hypothetical claimant be limited to lifting and carrying no more than five pounds occasionally, walking no more than two blocks at a time, and standing/sitting no more than twenty minutes at a time (R. 73). The VE stated that these restrictions require a "sedentary sit stand type of job" (*Id.*). Possible jobs include an order clerk, telephone clerk, or account clerk, (4,400, 2,300, and 1,900 positions respectively), numbers which the VE reduced from the DOT to account for the sit/stand option (R. 73-74).

8

If the hypothetical individual could not lift anything, or if the pain took the individual off task more than fifteen percent of her work time, the VE testified that all competitive employment would be precluded (R. 74-75)

**D.**

In a written opinion dated June 10, 2010, the ALJ found that Ms. Wood was not disabled after evaluating her claim under the five-step sequential process detailed in 20 C.F.R. § 404.1520(4). At Step 1, the ALJ found that Ms. Wood had not engaged in substantial gainful activity since her alleged onset date, May 1, 2007 (R. 26). At Step 2, the ALJ determined that Ms. Wood has the following severe impairments: "seronegative rheumatoid arthritis; arthritis; disorders of the back (scoliosis, bulging disks, disk disease); migraine headaches" (*Id.*). At Step 3, the ALJ found that Ms. Wood's impairments, alone or in combination, do not meet or medically equal a listed impairment, including Listing 1.02 (major dysfunction of a joint), Listing 1.04 (disorders of the back), and Listing 14.09 (inflammatory arthritis) (R. 27).

The ALJ then concluded that Ms. Wood has the RFC to lift and carry up to twenty pounds occasionally and up to ten pounds frequently; stand/walk about four hours in an eight-hour work day; sit about six hours in an eight-hour work day; and occasionally stoop, kneel, squat, crouch, or crawl; but she should not work at heights, climb ladders, or frequently negotiate stairs; and she should avoid extreme cold temperatures for prolonged periods of time and moving or dangerous machinery (R. 27). The ALJ found Ms. Wood was "overstating her symptoms and associated limitations," because she claimed to have extreme low blood pressure but has only had one acute episode, and despite alleging that she has bulging disks, MRIs showed minimal bulging (R. 27-28). Thus, while Ms. Wood's medically determinable impairments could reasonably be expected to produce her alleged symptoms, her statements

9

about "the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above [RFC] assessment" (*Id.*).

In determining the RFC, the ALJ discounted the opinions of Drs. Zamfirova and Hirsen. The ALJ reviewed Dr. Zamfirova's April 23, 2009 and March 24, 2010 RFC opinions, and Dr. Hirsen's March 2, 2010 RFC opinion, but determined that the functional limitations suggested by Drs. Zamfirova and Hirsen were "simply not reflected or supported" by their own treatment records and examination findings (R. 28-29). He stated that Dr. Zamfirova's treatment notes "show[] little in the way of complaints of pain," and Ms. Wood's reports of fatigue and trouble sleeping were "episodic" (R. 28). In addition, the ALJ found that the opinions of Drs. Zamfirova and Hirsen ran counter to the results of Dr. Hare's physical examination and to Dr. Chappidi's report that Ms. Wood is doing "reasonably well" with her migraine medication (R. 29). The ALJ also stated that Dr. Hirsen's report that Ms. Wood has nausea, vomiting, and visual disturbances with her headaches is "simply not reflected in the record" (*Id.*).

The ALJ assigned "great weight" to the RFC assessments of state agency Drs. Pilapil and Gotanco, dated May 13, 2008, and August 13, 2008, respectively, because "they are supported by and consistent with the evidence of record" (R. 29). The ALJ noted that they found Ms. Wood could perform light work with certain postural and environmental restrictions, because she could ambulate without assistance and had full strength in her finger grasp and hand grip (*Id.*).

At Step 4, the ALJ concluded that Ms. Wood could not perform any past relevant work given her RFC (R. 29). At Step 5, however, the ALJ found that there are jobs that exist in significant numbers in the national economy that Ms. Wood can perform (R. 30), and thus, she was not disabled under the Act (R. 31).

## III.

We uphold an ALJ's decision if it is supported by "substantial evidence," which is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) (internal citations and quotations omitted). In rendering his decision, the ALJ must "build a logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence." *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012) (internal citations omitted). Nevertheless, the ALJ must consider all relevant evidence, not only the evidence that favors his ultimate conclusion, and he must articulate the reasons he rejected relevant evidence. *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). If the Commissioner's decision lacks evidentiary support or an adequate discussion of the issues, it must be remanded. *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010); *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012).

Plaintiff challenges several aspects of the ALJ's decision, but we focus on one in particular: the way in which the ALJ addressed the opinions of Ms. Wood's treating physicians, Drs. Zamfirova and Hirsen (doc. # 24: Pl.'s Mem. at 8-14). "[A]n ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by medically acceptable clinical and laboratory diagnostic techniques, and (2) it is not inconsistent with substantial evidence in the record." *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010) (internal quotations omitted). If the ALJ does not give a treating physician's opinion controlling weight, he must give a sound reason for rejecting it. *Roddy*, 705 F.3d at 636-37. Moreover, "[e]ven if an ALJ gives good reasons for not giving controlling weight to a treating physician's opinion, []he has to decide what weight to give that opinion," considering "the length, nature,

11

and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and support for the physician's opinion." *Campbell*, 627 F.3d at 308 (citing 20 C.F.R. § 404.1527(d)(2)); *see also Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011) ("When an ALJ decides to favor another medical professional's opinion over that of a treating physician, the ALJ must provide an account of what value the treating physician's opinion merits"). Here, the ALJ did not follow any of these required steps in addressing the opinions of Ms. Wood's treating physicians.

The ALJ failed to explain what weight, if any, he assigned to the opinions of Drs. Zamfirova and Hirsen. The ALJ noted the limitations and findings in Dr. Zamfirova's arthritis RFC opinion from April 23, 2009 and headache RFC opinion from March 24, 2010, as well as Dr. Hirsen's RFC opinion from March 2, 2010, and then he concluded that they are "simply not reflected or supported" in the treatment records and examination findings (R. 28-29). This conclusory statement does not allow us to ascertain what weight the ALJ gave to the opinions of Ms. Wood's treating physicians.

More fundamentally, the ALJ failed to provide a sound reason for not giving controlling weight to the opinions of Ms. Wood's treating physicians. Beyond summarily stating that their opinions are not supported by the medical record, the ALJ's attempt to explain this determination amounts to impermissible cherry-picking. It is well-established that an ALJ "may not selectively consider medical reports," *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009), or "cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding." *Goble v. Astrue*, 385 Fed. App'x 588, 593 (7th Cir. 2010). That, however, is what the ALJ did here.

*First*, the ALJ presents no support in the record – much less a sound explanation – for his conclusion that Dr. Zamfirova's treatment notes do little to reflect Ms. Wood's complaints of pain (R. 28). Indeed, the ALJ reviews many of these complaints in his opinion (*see* R. 19-21). Even if the ALJ had pointed to certain medical reports in which Ms. Wood did not complain of pain, this would amount to impermissible cherry picking, ignoring that Ms. Wood complained of pain for years to Dr. Zamfirova, resulting in many diagnostic studies and referrals to a neurologist and rheumatologist. The ALJ also failed to mention a report by an SSA field office employee in February 2008 who observed that Ms. Wood walked and sat slowly, her fingers were starting to curl up from arthritis, and she wept when describing how her condition limited her activities (R. 167). These observations were consistent with some of the limitations set forth by Ms. Wood's treating physicians.

*Second*, the ALJ erred in dismissing Ms. Wood's complaints of fatigue and trouble sleeping as "episodic" (R. 28). As with mental illness, a person with arthritis, chronic pain, and migraine headaches "will have better days and worse days, so a snapshot of any single moment says little about her overall condition." *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). The ALJ's opinion here "cherry-pick[ed] facts to support a finding of non-disability while ignoring evidence that points to a disability finding." *Goble*, 385 Fed. App'x at 593.

*Third*, in finding that Dr. Chappidi's opinion "clearly" did not support the functional limitations set forth by Drs. Hirsen and Zamfirova, the ALJ points to one December 2008 report, in which Dr. Chappidi stated that Ms. Wood is doing "reasonably well on Migralief" (R. 28). However, the ALJ's opinion overlooks the fact that at the same visit, Dr. Chappidi prescribed two additional medications for Ms. Wood's headache pain (R. 259), and, in September 2009, Dr. Chappidi increased Ms. Wood's dose of Calan for additional headache prophylaxis (R. 526).

Thus, contrary to the Commissioner's claim (*see* doc. # 31: Comm'r Mem. at 5), the record does not support the conclusion that Ms. Wood's condition is "controlled" by medication.

*Fourth*, though the ALJ concludes that "clearly the results from Dr. Hare's examination would support little in the way of limitation" (R. 28), he does not point out what was inconsistent between Dr. Hare's single examination in May 2008 and the functional limitations Drs. Hirsen and Zamfirova set forth one and two years later. In fact, the ALJ notes in his opinion that Dr. Hare observed that Ms. Wood had poor posture with anterior rotation, mild to moderate thoracolumbar dextroscoliosis with narrowing of all joint spaces, arthritic changes at multiple levels including facet arthropathy (pain and discomfort caused by degeneration and arthritis of the facet joints), and a question of bone loss (R. 23). The ALJ did not explain why these observations by Dr. Hare would contradict the findings of Drs. Hirsen and Zamfirova.

Furthermore, the ALJ failed to show that in assessing the evidence from Ms. Wood's treaters, he considered the factors set forth in 20 C.F.R. 404.1527(d)(2), including "the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, [and] the types of tests performed . . . " *Campbell*, 627 F.3d at 308. As in *Roddy*, these factors "point toward giving significant weight" to Drs. Zamfirova's and Hirsen's assessment of Ms. Wood. *See Roddy*, 705 F.3d at 637. Both Dr. Zamfirova and Dr. Hirsen examined Ms. Wood on a regular basis over the course of multiple years, and both doctors completed RFC assessments. Furthermore, Dr. Hirsen is a rheumatologist, specializing in Ms. Wood's primary impairment, and the opinions of specialists opining on their area of expertise should generally be given more weight than non-specialists' opinions. 20 C.F.R. § 404.1527(c)(5); *see also Roddy*, 705 F.3d at 636 (ALJ's failure to provide sound explanation for decision not to give controlling weight to treating physician's opinion was "serious omission").

Instead, the ALJ assigned "great weight" to the RFC assessment of non-examining state agency physician Dr. Pilapil (and its affirmance by Dr. Gotanco), which was written three months before Ms. Wood was referred to the neurologist for her migraine headaches and almost two years before Dr. Zamfirova and Dr. Hirsen prepared their March 2010 RFC opinions. As the Seventh Circuit stated in *Jelinek*, "the ALJ would be hard-pressed to justify casting aside [the treating physician's] opinion in favor of these earlier state-agency opinions." *Jelinek*, 662 F.3d at 812 (noting that by the time of the ALJ's opinion, the state-agency opinions were two years old).[3]

Because the ALJ failed to provide an appropriate analysis of Ms. Wood's treating physicians' opinions, the ALJ did not build the required logical bridge showing his opinion to be supported by substantial evidence. We reverse and remand on this basis; we therefore need not address the other challenges raised by Ms. Wood to the ALJ's determination.

## CONCLUSION

For the reasons set forth above, this Court grants Ms. Wood's motion (doc. #23) and remands this case for proceedings consistent with this opinion. This case is terminated.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: March 18, 2013

---

[3] We further note that despite giving great weight to the opinions of the state agency physicians, the ALJ did not adopt their RFC assessments. Doctors Pilapil and Gotanco opined that Ms. Wood could stand/walk six hours in an eight hour work day. By contrast, the ALJ opined that Ms. Wood could stand/walk four hours in an eight hour work day. This functional limitation was not found in any doctor's RFC opinion in the record. An ALJ may not "play doctor" by substituting his or her own lay judgment for medical opinion. *See Chase v. Astrue*, 458 Fed. App'x 553, 557 (7th Cir. 2012); *see also Terry*, 580 F.3d at 476 (remanding where appellate court could not identify any evidence the ALJ could have relied on to support his RFC determination).

15